**Opinion filed August 1, 2024**



# In The

# Eleventh Court of Appeals

_____

## No. 11-23-00165-CR

_____

## SETH ADAM BLAKE, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**

**Taylor County, Texas**

**Trial Court Cause No. 29733-A**

## M E M O R A N D U M   O P I N I O N

Appellant, Seth Adam Blake, was indicted for three first-degree felony offenses: (1) the murder of Adrian Vizzera,[1] (2) the aggravated robbery of Caleb Martinez, and (3) the aggravated robbery of Andrea Ortiz. *See* TEX. PENAL CODE

---

[1]In its brief, the State notes that Adrian's last name is misspelled as "Vizzera" throughout the record and that the correct spelling of his name is "Vizzerra." Because we must rely on the evidence presented at trial, we will use the name as it appears in the record.

ANN. § 19.02(b), (c) (West Supp. 2023); § 29.03(a), (b) (West 2019). The jury found Appellant guilty of each offense. The trial court found the enhancement allegations to be "true" for each offense and assessed Appellant's punishment at imprisonment for (1) seventy-five years in the Institutional Division of the Texas Department of Criminal Justice (TDCJ) for the murder conviction, (2) forty-five years in TDCJ for the aggravated-robbery conviction involving Caleb Martinez, and (3) forty-five years in TDCJ for the aggravated-robbery conviction involving Andrea Ortiz. The sentences were ordered to be served concurrently.

In his sole issue on appeal, Appellant challenges the trial court's admission of State's Exhibit No. 26, which consists of twenty video clips captured by a home surveillance system (the video clips), over Appellant's Rule 403 objection. We affirm.

## I. *Factual Background*

Appellant resided in Taylor County with his roommates, Vizzera and Martinez. Martinez testified that on October 14, 2021, he arrived home at 7:06 p.m. to find Appellant intoxicated and yelling in the front yard. Appellant's neighbor, Clifford Coffman, testified that he saw Appellant that day "in the street screaming, hollering, [and] shooting off a weapon." Coffman also stated that, later that evening, Appellant knocked on his door and shot him five times.

Martinez testified that, at some point that night, Vizzera entered Martinez's room and told him that Appellant had "just shot the man across the street." Shortly thereafter, Martinez left the house. When Martinez returned, he went to the front porch and interacted with Vizzera. Martinez also testified that, around this time, he overheard Appellant and Appellant's cousin discussing "the man across the street" but stated that their conversation "made no sense." As Martinez was walking to the bathroom, he heard a loud "bang" from the front porch. Martinez was anxious and

2

testified that he heard someone yelling outside, which prompted him to leave the house. As Martinez left, he saw Appellant on the side yard and "believed he had a gun in hand"—along with Appellant's cousin, who was standing next to the tailgate of a pickup that was parked in front of their house. Martinez did not see Vizzera when he left the house.

When Martinez left for the second time, he went to pick up his girlfriend, Ortiz, from work. After he picked up Ortiz, Martinez returned to his house with Ortiz. Martinez retrieved some of his personal belongings from his room, but, as he was leaving, he saw Appellant outside holding a gun. Appellant followed Martinez to his car and proceeded to point the gun at Ortiz. Appellant then ordered Martinez and Ortiz to give him their cell phones, and threatened to shoot Ortiz if they did not comply with his demand. Martinez testified that Appellant said that he wanted Ortiz's cell phone because he did not want her to call the police. Martinez and Ortiz complied and gave Appellant their cell phones. Martinez testified that he then told Appellant that he was going to go see his daughter; Appellant allowed Martinez and Ortiz to leave, telling them that "[he had] already killed two people."

The next morning a truck driver found Vizzera's body on the roadside. Tracy Dyer, a forensic pathologist and the deputy chief medical examiner for Dallas County, testified that she performed an autopsy on Vizzera and determined that his death was caused by "homicidal violence including ligature strangulation and blunt force trauma." Dyer also testified that Vizzera had a "patterned injury" on his face which could be consistent with "the butt of a firearm."

During their investigation, officers with the Abilene Police Department recovered video footage from the home surveillance camera of Appellant's neighbor, which captured some of the events that occurred on October 14. At trial, the State offered Exhibit No. 26, a series of twenty video clips from the recovered

video footage, each approximately one-minute in duration. These video clips depict, among other things, (1) Appellant yelling at someone across the street with Vizerra present, (2) Vizzerra standing outside in the front yard of the house just before an individual is seen in the doorway of Coffman's residence and audible gunshots are heard, (3) Appellant's possession of a firearm, (4) Appellant standing close to Martinez's vehicle and taking Martinez's and Ortiz's cell phones, and (5) Appellant's admission that he had "killed two people." Abilene Police Detective Michael Scott testified that the video clips showed a pickup outside Appellant's residence, which he believed was used to transport Vizzera's body that night.

Appellant's trial counsel objected to the admission of the video clips based on (1) "a lack of foundation," (2) Rule 403, that the probative value of the video clips would be substantially outweighed by their prejudicial effect, and (3) Rule 404(b), that the video clips constituted improper extraneous-offense evidence.[2] *See* TEX. R. EVID. 403, 404. The State argued that, while the video clips were inherently prejudicial, the video clips were probative to show Appellant's motive for murdering Vizzera—Appellant intended to kill Vizzera because he was a witness to the shooting of Coffman. The trial court overruled Appellant's objections and admitted the video clips.[3]

## II. *Standard of Review*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). This

---

[2]Appellant restricts his argument on appeal to the second contention—that the trial court abused its discretion when it admitted State's Exhibit No. 26 over Appellant's Rule 403 objection.

[3]Following the trial court's ruling, Appellant's trial counsel clarified with the State "which ones were subject to the objections," to which the State responded that it "believe[d] it's number 11 and number 12 from 26." Appellant's trial counsel re-urged his "objection" and requested a running objection without further clarifying which video clips were subject to his objection, or whether he was referring to his first, second, or third objection to the video clips.

standard also applies to a trial court's decision to admit or exclude extraneous-offense evidence. *Perkins v. State*, 664 S.W.3d 209, 216–17 (Tex. Crim. App. 2022); *Arevalo v. State*, 675 S.W.3d 833, 843 (Tex. App.—Eastland 2023, no pet.). The trial court's decision will be upheld as long as it was within the "zone of reasonable disagreement." *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018) (quoting *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007)). Further, we will not reverse a trial court's evidentiary ruling, even if the trial court's reasoning is flawed, if it is correct on any theory of law that finds support in the record and is applicable to the case. *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016); *Luna v. State*, 687 S.W.3d 79, 95 (Tex. App.—Eastland 2024, pet. ref'd).

### III. *Analysis*

In his sole issue on appeal, Appellant argues that the trial court abused its discretion when it admitted State's Exhibit No. 26—the video clips—over his Rule 403 objection because the video clip contents were unfairly prejudicial. *See* TEX. R. EVID. 403. Specifically, Appellant argues that the "probative value of the evidence was substantially outweighed by the chances of substantial unfair prejudice" because: (1) the video clips, when assessed independently from the other evidence admitted at trial, are lacking in probative value because the video clips alone do not prove, nor show, that Appellant committed the offenses for which he was convicted, or that he shot Coffman; (2) the video clips do not show that Appellant's motive for murdering Vizzera was an "effort to silence any witness[es]" to the shooting of Coffman; and (3) the video clips were repetitious and irrelevant.

"Generally, all relevant evidence is admissible." *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009) (citing TEX. R. EVID. 402). "Evidence is relevant if it tends to make a fact 'of consequence in determining the action' more or less

probable than it would be otherwise." *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021) (citing TEX. R. EVID. 401). Additionally, the considerations under Rule 403 for determining the admissibility of videos, audiovisual recordings, and photographs are generally the same. *See Gordon v. State*, 784 S.W.2d 410, 411 (Tex. Crim. App. 1990) ("Motion pictures are just a collection of photographs and the rules surrounding admission are the same as those for still photographs.") (quoting *Marras v. State*, 741 S.W.2d 395, 404 (Tex. Crim. App. 1987)).

Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Hall v. State*, 663 S.W.3d 15, 34 (Tex. Crim. App. 2021); *Arevalo*, 675 S.W.3d at 851; *Walter v. State*, 581 S.W.3d 957, 978 (Tex. App.—Eastland 2019, pet. ref'd) (quoting *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002)). However, Rule 403 also provides that relevant evidence may nonetheless be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." TEX. R. EVID. 403. So even if a trial court determines that evidence is relevant and admissible for a non-conformity purpose, Rule 403 may still preclude its admission if, on balance, the probative value of the evidence is substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403; *Perkins*, 664 S.W.3d at 216. When conducting a Rule 403 analysis, a trial court must balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest [a] decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Hall*, 663 S.W.3d at 32 (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)); *Roe v. State*, 660 S.W.3d 775, 784 (Tex. App.—Eastland 2023, pet. ref'd.).

We begin with the first *Gigliobianco* factor, which focuses on the inherent probative force of the proffered evidence. *Roe*, 660 S.W.3d at 784. "[P]robative value" in Rule 403 refers "to how strongly an item of evidence 'serves to make more or less probable the existence of a fact of consequence to the litigation[,] coupled with the proponent's need for that item of evidence.'" *Id.* at 784–85 (quoting *Gigliobianco*, 210 S.W.3d at 641); *see also Luna*, 687 S.W.3d at 99.

Although motive is not an element of murder, it may constitute a circumstance that is indicative of a person's guilt and therefore be admissible as an evidentiary fact that leads inferentially to an elemental fact, such as identity, intent, absence of mistake, or accident. *See Clayton v. State*, 235 S.W.3d 772, 781 (Tex. Crim. App. 2007); *Rankin v. State*, 974 S.W.2d 707, 718 (Tex. Crim. App. 1998) (citing *Montgomery v. State*, 810 S.W.2d 372, 387–91 (Tex. Crim. App. 1990) (op. on reh'g)). Here, the State offered the video clips to show Appellant's intent or motive for committing the murder of Vizzera. *See Colone v. State*, 573 S.W.3d 249, 267 (Tex. Crim. App. 2019) ("[T]he prosecution may always offer evidence to show motive.") (internal quotation marks omitted); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.36 (West 2018) (in prosecutions for murder, the parties must be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the state of mind of the accused at the time of the offense).

Martinez testified that Vizzera entered his room and told him that Appellant had "just shot the man across the street," and after that Martinez left the house. Martinez testified that he did not see Vizerra again that night. However, Martinez's testimony does not explain where Vizzera was during the shooting, if Vizzera

witnessed Appellant shoot Coffman, or if Appellant knew that Vizzera was a witness to the shooting of Coffman. In Video Clip No. 8, Vizerra can be seen standing outside with Appellant, who is yelling across the street in the direction of Coffman's residence. In Video Clip Nos. 9 and 10, Vizerra is seen standing in the front yard before a gunshot is heard. In Video Clip Nos. 11 and 12, Vizerra can be seen standing outside of Appellant's house just before an individual is seen standing in the doorway to Coffman's residence and another gunshot is heard. These events occurred within approximately twenty-two minutes of each other. According to Detective Scott, Video Clip No. 12 was the last time that Vizzera was seen alive on video, and Vizzera is not seen in the eight subsequent video clips. Further, Detective Scott identified Appellant as the individual standing in the doorway of Coffman's home.

Based on the admitted video clips, the trial court could have reasonably concluded that the effect of this video evidence made the State's assertion that Vizzera witnessed Appellant shoot Coffman more or less probable, because the State had no other available evidence to establish that Vizerra was standing outside and witnessed the shooting. *See Montgomery*, 810 S.W.2d at 390. Thus, the video clips were relevant and probative to show that Appellant had the intent or motive to murder Vizzera because he was a possible witness to the shooting of Coffman. *See Gigliobianco*, 210 S.W.3d at 641; *Roe*, 660 S.W.3d at 784–85.

Moreover, despite Appellant's contentions, the video clips are relevant and probative in assessing other elements of the charged offenses, because the video clips show (1) Appellant's possession of a firearm; (2) Appellant taking Martinez's and Ortiz's cell phones; and (3) Appellant's statements and admissions to Martinez that he "punched that n---a 30 times" and that he "killed two people." *See* PENAL §§ 19.02, 29.03.

8

Evidence that Appellant possessed a firearm was highly probative as to each of the charged offenses. First, the video clips were probative in that they strengthened the State's argument that Appellant murdered Vizzera because there was testimony that Vizerra's murder could have been caused by blunt force trauma from the "butt of a firearm." As such, the video clips made the fact that Appellant used a firearm to murder Vizerra more probable. *See Roe*, 660 S.W.3d at 784. Second, for the aggravated robbery offenses, Martinez and Ortiz testified that Appellant pointed a firearm at Ortiz when he threatened, demanded, and eventually took their cell phones from them. Their testimony is corroborated by the video clips, which makes Appellant use of a firearm more probable. *See id.* Appellant's statements as captured by the video footage are also highly relevant and probative to show Appellant's mental state and to infer his "consciousness of guilt" as he confessed to his involvement in the murder of two people. *See id.* at 785. Finally, the video clips assisted the jury in assessing witness credibility, and in resolving any inconsistencies, concerning Appellant's behavior, demeanor, or statements made by him during the commission of the charged offenses. *See Luna*, 687 S.W.3d at 99. As such, the first factor weighs in favor of admission.

The second *Gigliobianco* factor—the State's need for the evidence—also weighs in favor of admission as the trial court could have reasonably concluded that the State had a significant need for this evidence. *See Gigliobianco*, 210 S.W.3d at 641–42. As we have previously discussed, the video clips were necessary and probative evidence to show Appellant's intent or motive for the murder of Vizzera, because there was limited evidence available to the State to establish this fact except for Martinez's testimony. *See Garcia v. State*, 630 S.W.3d 264, 269 (Tex. App.—Eastland 2020, no pet.). Further, the video clips were necessary for the jury to assess the credibility of the State's witnesses and to resolve any inconsistencies in their

testimony and provided the necessary context for the events that occurred that night. For example, Martinez testified that Appellant made him retrieve a pressure washer before he pointed the firearm at Ortiz and demanded their cell phones; however, the video clips contradict Martinez's testimony and show that Martinez walked directly to his vehicle without retrieving the pressure washer, followed by Appellant who asked for his cell phone. The video clips were probative in establishing the elements of the charged offenses and corroborated the testimony of others, such as Martinez's testimony that Appellant said that he "killed two people," that Appellant possessed a firearm that night, and that Appellant took Martinez's and Ortiz's cell phones to prevent them from calling the police. Therefore, the trial court could have reasonably concluded that the video clips were necessary to show that Appellant committed the charged offenses. *See Gigliobianco*, 210 S.W.3d at 641.

The remaining four *Gigliobianco* factors concern the potential negative effects of the proffered evidence. *Garcia*, 630 S.W.3d at 269. Of these factors, the third, fourth, and fifth *Gigliobianco* factors focus on the tendency of the evidence to suggest a decision on an improper basis, the potential to confuse or distract the jury from the main issues, and the potential to mislead the jury. *Hall*, 663 S.W.3d at 33; *Roe*, 660 S.W.3d at 785. "Unfair prejudice refers to the evidence's 'tendency to tempt the jury into finding [the defendant] guilt[y] on grounds apart from proof of the offense charged.'" *Perkins*, 664 S.W.3d at 216 (quoting *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005)). Here, the admission of the video clips was undoubtedly prejudicial to Appellant's case, as all evidence presented against a defendant is designed to be prejudicial; however, the primary focus of Rule 403 is not only with what constitutes *prejudicial* evidence, but rather with evidence that is *unfairly* prejudicial. TEX. R. EVID. 403; *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013).

We note that while Appellant does not challenge on appeal the video clips' depiction of Coffman's shooting as being improper extraneous-offense evidence, Appellant does argue that the video clips of the shooting were unfairly prejudicial. To this point, the trial court included a limiting instruction in its charge regarding the jury's consideration of extraneous offenses and bad acts. We presume that the jury obeyed this instruction. *See Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003) (appellate courts presume that the jury follows instructions); *Roe*, 660 S.W.3d at 785; *see also Arevalo*, 675 S.W. 3d at 851; *Wishert v. State*, 654 S.W.3d 317, 334 (Tex. App.—Eastland 2022, pet. ref'd). Thus, the trial court took appropriate measures to mitigate the potential improper influence of the video clips as they pertain to any extraneous offenses, and any potential harm to Appellant was mitigated by its limiting instruction. *See Luna*, 687 S.W.3d at 104; *Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd).

Additionally, there was minimal risk that this evidence would confuse or distract the jury from the main issues of the case. The video clips directly related to, and were probative of, the elements of the charged offenses of murder and aggravated robbery. The video clips depicted Appellant's actions that night and corroborated other witness testimony concerning the charged offenses. The video clips were not scientific in nature, nor were the video clips overly complex for the jury to consider. *See James v. State*, 623 S.W.3d 533, 550 (Tex. App.—Fort Worth 2021, no pet.).

The video clips are not particularly graphic, offensive, or otherwise excessively or unfairly prejudicial to Appellant. The specific video clips that captured an individual shooting Coffman do not show any injuries to him or other graphic evidence as a result of the shooting and were necessary to show Appellant's intent or motive for murdering Vizzera. *See Erazo v. State*, 144 S.W.3d 487, 491–

92 (Tex. Crim. App. 2004) (holding that when an element of a photograph is "genuinely helpful to the jury . . . the photograph is inadmissible *only* if the emotional and prejudicial aspects substantially outweigh the helpful aspects") (emphasis added). As such, the trial court could have reasonably concluded that the contents of the video clips were not unfairly prejudicial, did not have a tendency to suggest the jury's decision on an improper basis, and did not have a tendency to confuse, distract, or mislead the jury from the main issues in the case. *Id.*; *see Gigliobianco*, 210 S.W.3d at 641–62; *Garcia*, 630 S.W.3d at 269. Therefore, we conclude that the third, fourth, and fifth *Gigliobianco* factors weigh in favor of admission.

As for the sixth *Gigliobianco* factor—the time needed to present the evidence and whether it is cumulative of other evidence—the admission of the video clips did not cause an undue delay or result in the needless presentation of cumulative evidence. Here, the video clips were efficiently authenticated, and it only took approximately thirty-six minutes to present this evidence to the jury over the course of a two-and-a-half-day trial. As such, the amount of time dedicated to offer, admit, and present the video clips to the jury was minimal. *See Gigliobianco*, 210 S.W.3d at 641. Additionally, while there was some testimony regarding the events that were captured in the video clips, this evidence clarified the testimony of Martinez and other witnesses and provided a different perspective from other admitted evidence concerning the charge offenses. *See Garcia*, 630 S.W.3d at 270. Thus, the trial court's decision to admit these video clips did not disrupt the efficient administration of the trial, and the video clips were not overly cumulative of other evidence presented.

Having considered the *Gigliobianco* factors, we conclude all factors weigh in favor of the admission of State's Exhibit No. 26. Therefore, the trial court did not

abuse its discretion when it admitted this evidence.  Accordingly, we overrule Appellant's sole issue on appeal.

## IV. *This Court's Ruling*

We affirm the judgments of the trial court.


W. STACY TROTTER

JUSTICE


August 1, 2024

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.